The first case of the day is United States of America v. William Gross. Mr. Stoes. Good morning, Your Honors, and may it please the Court. Good morning. I am Assistant Federal Public Defender Tarrant Stoes, counsel for Mr. William Gross, Jr., and if it's all the same to the Court, I'd like to focus on the first issue regarding Mr. Gross's right to counsel at trial. If time permits, then I'll briefly touch upon the second issue regarding the shackling during trial. It's our position that Mr. Gross should not have been to represent himself at trial, and this is so for three reasons. Number one, Mr. Gross never unequivocally asserted that he wanted to represent himself at trial, and indeed, during the pretrial proceedings, he repeatedly objected to self-representation. Number two, when we get to trial, Mr. Gross engages the assistance of his stand-by counsel on the issue. And third, the record, when compared with the relevant Fretta factors, confirms that Mr. Gross did not understand fully the advantages, disadvantages, and dangers of self-representation so as to have voluntarily and knowingly waived his right to trial with counsel. It seems to me like Judge Huck made heroic efforts to make sure that your client understood that he was, in fact, unequivocally asserting his right to represent himself. I mean, you can't really fault Judge Huck, right? I mean, he tried his level best to elicit the right answers. Your client was tough, right? We disagree, Your Honor, and there was much more that could have been done under the circumstances. Judge Huck, there were two hearings prior to trial when this issue came up and was addressed directly by the court. Judge Huck, during the first telephonic hearing, which was six weeks before trial, seemed to reach his conclusion within the first six pages of the transcript. I'm not sure how much time that was, but it's about a 13-page transcript, and he expressed confusion as to what the filings themselves meant, but what is certain is that Mr. Gross objected two times during that hearing, and what's actually telling is that the government seemed to express concern that Judge Huck didn't actually do enough to ensure that Mr. Gross was informed fully of the disadvantages of proceeding pro se, and so what the government did is they filed a notice asking the court to conduct a formal FARETA hearing, and they submitted a set of form questions that could be asked. So, Judge Huck schedules the second hearing. It's designated as a FARETA hearing. Now, what's important to note at the outset is one of the purposes of a FARETA hearing, as Gross v., or excuse me, Cross v. United States explains, is to avoid constitutional error of this magnitude by eliciting from the defendant, and therefore making an express record for review the defendant's unambiguous decision to represent himself at trial. Can I ask you a question about that? I'll tell you what concerns me, is your client said repeatedly that he was representing himself in propria person, and that he rejected all attorneys and officers of the court, and so to me that seems like he's saying he wants to represent himself, and I'm not going to accept any attorney that you appoint, and he did not attempt to retain anyone So, I'm wondering, I know he said also, I'm not proceeding pro se, but we have the Gary case, which says you can't sort of manipulate the proceedings to try to build error into them, and when he repeatedly says, I'm representing myself in propria person, and I'm rejecting all attorneys and officers of the court, what is the court to make of that? I guess my question, to put more of a point on it, is what would be the things that your client said or did that would make it so that a district court could conclude that he did not unambiguously waive his right, as opposed to trying to manipulate the court and play games? Everybody immediately jumped at, oh, sovereign citizen, manipulation of the court, but nobody actually went back and looked at the filings and tried to understand what they meant, and as we explained in our brief, improper persona at common law traditionally was a designation that allowed a defendant who didn't want to, who wanted to challenge the jurisdiction of the court to be able to do so, but what they understood was that in order for me to challenge the jurisdiction of the court, I can't come into court with an attorney, because that's conveying to the court that I do accept the court's jurisdiction, and so when he's saying I object to all attorney types, I'm preceding a propria persona, that's the position that he seems to be taking, and indeed, during the trial proceedings, you see on at least two occasions where he makes a special appearance for the record, which, whether we're talking about a civil case or a criminal case, is consistently associated with some sort of jurisdictional position that you're taking. What do you think that Judge Hock needed to do that he did not do here? Number one is, for example, during the Feretta hearing of January 18th, he asked, in very pro forma fashion, this list of questions that was drafted and provided by the government, and at the very least, there should have been some follow-up, regardless of whatever Mr. Gross's answer to the questions was. He just continued on in the list of questions without- What was the follow-up that you think should have occurred? So, for example, court, you've done your own research. Defendant, yes. Court, okay. Next question. Have you been involved in a prior criminal proceeding? Defendant, no. Court, okay. Next topic. So, when you look at, for example, Feretta, the reason why the court said that Mr. Feretta was allowed to actually represent himself is because there was a discussion, a follow-up discussion, after Mr. Feretta disclosed that he had done some research. And so, with the trial judge, they said, okay, well, let's see how you've been doing on your research, and they engaged in a colloquy regarding jury and paneling, the different grounds for cause challenges. How many preemptory strikes do you have? Did you read the California Code? Like, those are the sorts of follow-up questions that we would expect. Let me give you an example, right? So, you have a defendant like Mr. Gross, who is, this is his first time, his first criminal rodeo. We know that he doesn't have any criminal history points. He didn't grad, he dropped out of high school. Judge Huck- Went all the way up until the 12th grade, right? Right, right. But on that point, and I'll circle back, it's not simply that he got to 12th grade, it's about how well you actually did in 12th grade. Because we need to understand, do you have the capacity to be able to understand what's going on? And when you look at the cases, those are the factors that the court actually looked at. Like, what about your experience equips you with the skill set to be able to understand what's going on here and ably represent yourself? And so, you know, the government bears the burden on waiver, or excuse me, on his validity, and they haven't pointed to any sort of evidence to suggest that, you know, he did well in high school. And quite frankly, you know, if he's dropping out at 12th grade, that indicates that he probably didn't do that well. Have we ever affirmed a conviction where the court didn't engage in a single FREDA inquiry at all, and yet found based on the record that the Fitzpatrick factors had been met? I haven't found that. In exactly that case that's cited in both your briefs, there was no, there was no FREDA colloquy in Owen, wasn't there? Right, and they looked at, Owen looked at the record to then, in hindsight, determine how ably they were able to. Can we do the same here? In other words, forget the FREDA thing. You may be right that the inquiry wasn't great or wasn't sufficient or more should have been done. But can we look at what discussions in the transcript here? We have sentencing. We have a pretty fulsome record of your clients' interactions with the district court to then filter those through the eight Fitzpatrick factors, right? Right, and if you look at Owen's, you look at U.S. v. Stanley, seven out of the eight factors actually vote in favor of the government, in favor of waiver. And here I believe that you don't even get to three or four. So, for example, he doesn't have any criminal history, any criminal trial experience. That's one of the factors. No, that's not one of the factors. The factors is an understanding of the federal rules of evidence, criminal procedure, and trial procedures, right? That's the factor. Actually, there are eight factors and the fourth or fifth one actually says the defendant's criminal trial experience, your honor. Right, but related to as an understanding of those things. And here we have a record which says that I know the rules, I've read them, I understand them, I know the evidence, I understand them. But then he gets to trial and he's pretty much a deer in headlights. He doesn't object to any of the government's testimony, or excuse me, exhibits. He barely objects to the witness testimony. He tries to dismiss the case, but he doesn't explain why, so he doesn't have a clear understanding of the rules of criminal procedure. Did he cross-examine witnesses? He did not. He was given. Didn't he examine himself? Didn't he give both an opening and closing statement? It seemed to me as if he performed as well as could be performed for someone who had overwhelming evidence of guilt that he was the one who distributed the child pornography. Well, sure, he went through the steps as a matter of form, but again, the question is, did you actually appreciate what was going on? For example, he gave his testimony and then on cross-examination, he didn't object to questions that went beyond the scope of his examination. And what that allowed the government to do was then bring in his confession on a rebuttal, a confession that they chose not to put in on their own case in chief. And so that indicates that he clearly did not appreciate the rules of procedure like Mr. Ferretta did, like Gary did, and was not in a position to knowingly and voluntarily waive his right to trial counsel. Thank you. Thank you, Mr. Stowes. You've reserved five minutes of rebuttal time. We'll hear next from Mr. Juman. Good morning and may it please the court, Robert Juman for the United States with me at council table or Joe Agassi and Abby Waxman, who are the trial USAs. I believe the court understands the government's arguments with respect to the waiver of counsel. So I don't want to belabor that point unless the court has any questions. And I think the rest of our arguments are also very clear from the papers, but I'm happy to ask, answer any questions the court has. If there aren't any, then we just ask the court. Oh, yes, yes, please. Why is that okay? It's not okay, your honor. And we agree. We agree. And we agree that the court should have made an individualized finding if, if shackling was necessary or made a finding. Is this the first time this has happened with this particular district court? It is not. This happened with the same district court in the case of more, uh, which we cite in our briefs. What do we do with that? Your honor? Uh, I would say that your honor can do what the court did in more, which is make a very strong admonition. I will say also that on behalf of my office, we've made clear to trial team, to everyone involved and to other new USA is that this is an issue and that it should not happen. And we recognize the importance of it. Um, as the court pointed, you know, as the court found in there are three problems with shackling, uh, not the least of which is the dignity and the, of the proceedings is impacted. I know you weren't there and I know, uh, it's not explicitly indicated, but there are, are there indications in the record which suggests that the jury saw the shackles? There are none, your honor. I believe that is key to the way we have to analyze. Well, clearly it must've seen the shackles. I mean, he was representing himself. He was shackled at the wrists, right? I mean, I think we have to assume the jury saw the shackles. I would only, my only caveat to making that assumption is that it is an assumption. It would be a finding of fact in a sense and inference not warranted by anything of the record. The defendant was wearing long sleeves. And as we cited in the Harris case, unlike prison garb, let me ask you a question. What was the shackle on his wrist attached to? We don't know. And the record doesn't explain it. It's not really a shackle if it's not attached to anything, is it? It's, I mean, by definition, a shackle is attached to something. I agree. And I, we don't dispute that he was shackled. What could it have been attached to from his wrist that you would not have seen? His other wrist. Well, how would you not see that if he's representing himself and he's getting up and he's writing at the table? Your honor, I, I, I hear you. I will only say that I mean, you're not really going to pursue this argument, are you? I'm trying to tell you, I can't understand how that could be. So, I mean, I might be alone on that. We will, we're, for purposes of the argument, we're happy to concede, in fact, that this court could infer that. But if the court wants to go that step, they also have to then make some kind of factual finding as to the degree and extent of the viewing. There is authority that suggests an I do not understand how a shackle at the wrist, when the person is representing himself, could possibly be minimal. So. We'll grant that. Okay. We'll absolutely grant that. However, you have in this case two unique factors which have to be addressed. One is the fact that the defendant was given the opportunity to have them removed and declined. So you may ask yourself, why would any defendant not want their shackles removed? In this case, this record gives us a very clear answer. He wanted the jury to see them. He wanted the jury to know he was imprisoned. He chose to remain in prison garb. He made it a feature. In fact, the sole feature of his opening and closing arguments was to, to seek sympathy by telling the jury, I've been shackled. I've been imprisoned. He didn't have a substantive defense. He relied on that sympathy factor. So this was a case where, like in Wilson, the defendant wanted to make an issue of it. So, again, the question, why would someone not want their shackles removed when they have the opportunity? Because they wanted the jury to know. And so that prevents there from being plain error in this case. In addition, this is, again, not a close case. There was literally overwhelming evidence. Overwhelming almost is an understatement. Can I ask you a question? Does the fact that he was asked whether he wanted his shackles removed and he declined to have them removed and then used them to argue to the jury that that was part of the reason they should acquit him suggest in any way? Does that in any way bear on? In other words, it seems like maybe there's some attempt and manipulation going on that he's now complaining about being shackled. Does that at all bear on our analysis of the attorney issue? I can't say for sure. There is evidence in the record that the assigned standby counsel was concerned with some of the ethical concerned of our ethics of what Mr. Gross was asking her to do. So it's possible that related to something that Mr. Gross wanted to do in relation. I'm not going to speculate. We don't know. The record does not contain any such information. All we do know is that Mr. Gross never objected. And asking to have them removed as he did midway through the second day of trial isn't the same as objecting to them having been on him in the first place. What we do have in the record is that he's asked if he wants them removed. He says no. And that he makes an enormous deal of them in his jury addresses. And we also have, again, in terms of the plain error standard, even if the deck presumption applies, even if we assume the jury saw them and we say the deck presumption applies, it's a presumption. It can be rebutted if, beyond a reasonable doubt, the government establishes that it would not have made a difference to the verdict. Here, you literally have overwhelming evidence. The defendant on the witness stand admitted, yes, that's my penis. That's my face. Other than admitting that his code name was Will G-880, he basically admitted to everything. He gave a post-arrest admission where he said, yes, I sent child pornography to the undercover. And you had the testimony of the girlfriend and the IP evidence that he was using the Wi-Fi at his girlfriend's parents' home and his own home. The evidence was overwhelming. So in that context, because we're under plain error review, even if the deck presumption applied, it's overcome by that evidence. If the court has no further questions, again, we'll rest on our papers and we ask the court to affirm the conviction. All right. Thank you very much, Mr. Juman. Mr. Stoes, you have five minutes. Thank you, Your Honors. Number one, my colleague says that Mr. Gross never objected to the shackles. By the time that this issue of whether he was told, hey, do you want to take the shackles off or not? And he said, no. The jury already had opportunities to see the shackles on him. During voir dire, Mr. Gross was directed to stand at the lectern to address the jury so that they could see whether or not they knew him and were conflicted out of serving on the jury panel. And then right before this colloquy about him saying, no, I don't want the shackles to be taken off, he came up to the bench for a sidebar and the court had already explained that it was a cramped courtroom and they had all 51 venir panel members in there. And so, there was plenty of opportunity for the jurors to see Mr. Gross and the jury was actually selected from that panel. So, the damage was already done by the time that this conversation came up. Number two, your honor asked if I ask you something about that. I think that that is certainly a valid point. However, I wonder how the fact that he then attempted to use his shackling as an affirmative part of his defense affects that. I think at best, that's just the government's inference. There isn't any direct evidence of that him ever saying. Well, he did though. I mean, in his opening, he said that he was being held at FTC and whatever. But in his closing, he said, we're shackled, we're brought over here like slaves. I couldn't prepare for the trial because I was in lockdown at FTC. And so, maybe I'm misremembering, but I thought he said that in his closing. And I wonder how, maybe it doesn't affect the analysis, but it seems like it might affect the analysis as to whether his initial shackling before he was asked if he wanted to be shackled and he said, yeah, he would remain shackled, whether that is a reversible problem. So, the issue is that, as your Honor indicated, that happened at the very end of the trial, but yet he went through an extended period of time with the shackles on. And again, the jurors had already seen the shackles, or at least there's a reasonable assumption that they did based on, you know, for the reasons that I mentioned. And so, I think any curtailing of prejudice at that point really is far removed from the issue and the circumstances under which this issue arose. And then your Honor asked, well, does the shackling bury any relationship with the assistance of counsel issue? And it does, because in Deck v. Missouri, the three reasons why the court expressed concern about this is because, one, it impacts the assistance of counsel and the communication with counsel. And number two, aside from, you know, that it confuses the mental faculties of the defendant, and your Honor, I believe this goes back to your original question, is how ably was he performing during trial? Again, a fair reading of the full transcript, he was a deer in headlights, and the shackles are just a distraction for him to be able to focus on what really matters at that time. The problem with that argument is, this goes to the question Judge Rosenbaum asked, which is, he was explicitly asked by his standby counsel at the beginning of the case. This doesn't go to whether the jury saw it or not, just do you want it there or not? And he said, no, I want them. He explicitly refused. And then the second he asked on the second day of trial, I want them off, he said, they were immediately taken off from the best that I can tell from the record. So, it's hard for me to say that this somehow impeded his ability to represent himself when he himself asked for that very thing to be done during at least the first day and a half of the trial. So, I believe you can actually see an example of this during the jury selection process. There was a slew of panel members who indicated, I cannot look at the evidence. And his first response was that they should be taken off. But then he vacillated about that, and it dawned on him, oh, wait, they're not going to look at the evidence. I want those members on the jury. So, that's just one example. I do believe that and we also argue cumulative error. So, that coupled with the fact that you have somebody who didn't have the benefit of counsel, the government bears the burden of demonstrating the validity of the waiver, and the court indulges in every reasonable presumption against the waiver of trial counsel. We would ask that the court reverse due to structural error, remand to the district court for further proceedings. Thank you, Your Honors. Thank you, counsel.